**Slip Op. 03-81**

# UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————

|  |  |  |
|---|---|---|
| ALZ N.V., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Before: WALLACH, Judge |
| | : | Court No.: 01-00834 |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | **PUBLIC VERSION** |
| | : | |
| ZANESVILLE ARMCO INDEPENDENT | : | |
| ORGANIZATION, et al., | : | |
| | : | |
| Defendant-Intervenors. | : | |

———————————————————————

[Plaintiff's 56.2 Motion For Judgment Upon The Agency Record granted; Department of Commerce's final countervailing duty results remanded.]

Decided: July 11, 2003

Shearman & Sterling (Thomas B. Wilner and Christopher Ryan), for Plaintiffs.

Robert D. McCallum, Jr., Assistant Attorney General, Civil Division,United States Department of Justice; David M. Cohen, Director, Commercial Litigation Branch, Civil Division; A. David Lafer, Senior Trial Counsel; John C. Einstman, Trial Attorney; Arthur D. Sidney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Of Counsel, for Defendant.

Collier Shannon Scott, PLLC (Lynn Duffy Maloney), for Defendant-Intervenors.

## OPINION

**WALLACH, Judge:**

# I
# INTRODUCTION

This action comes before the court on Plaintiff ALZ N.V.'s ("ALZ") Motion for

Judgment Upon the Agency Record, which contests certain aspects of the United States

Department of Commerce, International Trade Administration's ("Commerce") determination in

Stainless Steel Plate in Coils From Belgium: Final Results of Countervailing Duty

Administrative Review, 66 Fed. Reg. 45,007 (Aug. 27, 2001) ("Final Results").[1]

For the reasons set forth below, the court remands this matter to Commerce with

instructions to conduct further proceedings in conformity with this opinion.


# II
# BACKGROUND

On June 7, 2000, Commerce published a notice initiating an administrative review of the

countervailing duty order on stainless steel plate in coils from Belgium for the period of review

from September 4, 1998 through December 31, 1999. See Initiation of Antidumping and

Countervailing Duty Administrative Reviews, Requests for Revocation in Part and Deferral of

Administrative Reviews, 65 Fed. Reg. 64,662 (Oct. 30, 2000).

On July 26, 2000, Allegheny Ludlum Corp., Armco, Inc., Lukens, Inc., and United

Steelworkers of America, AFL-CIO/CLC (collectively "petitioners") submitted new allegations

and requests concerning alleged subsidies provided by the Government of Belgium ("GOB").

Petitioners alleged, among other things, that the GOB's purchase of Sidmar N.V.'s ("Sidmar")

---

[1] Allegheny Ludlum Corporation, AK Steel Corporation, Butler Armco Independent Union, the United Steel Workers of America, AFL-CIO/CLC, and Zanesville Armco Independent Union intervened in the present action but did not participate in briefing before the court or at oral argument.

common and preference shares in 1984 provided a countervailable subsidy to Sidmar. Petitioners also requested that Commerce reinvestigate the GOB's purchase of ALZ common and preference shares in 1985, as well as Sidmar's debt-to-equity conversion in 1985. See Letter from Lynn Duffy Maloney, Collier Shannon Scott, PLLC, to Secretary of Commerce, U.S. Dep't of Commerce, Stainless Steel Plate in Coils from Belgium: Questionnaire Modifications and New Subsidy Allegations at 1(July 26, 2000); Appendix Accompanying the Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Agency Record ("App.") Tab 2. Both of these transactions were found not to provide a countervailable benefit in Commerce's original investigation into the programs. See Final Affirmative Countervailing Duty Determination; Stainless Steel Plate in Coils from Belgium, 64 Fed. Reg. 15,567 (Mar. 31, 1999) ("Original Determination"). Petitioners did not submit new information to support their allegations; instead, they relied exclusively on information provided by ALZ and the GOB in the original determination.

ALZ opposed the petitioners' request that Commerce reinvestigate the equity programs. On October 19, 2000, however, Commerce determined to initiate a review of the three equity infusions. See Memorandum from Team to Richard W. Moreland, Deputy Assistant Secretary for AD/CVD Enforcement, Countervailing Duty Administrative Review of Stainless Steel Plate in Coils from Belgium (Oct. 19, 2000) at 4-7 ("New Subsidy Allegations"); App. Tab 4.

On April 23, 2001, Commerce published the preliminary results of its countervailing duty administrative review. See Stainless Steel Plate in Coils from Belgium: Preliminary Results of Countervailing Duty Administrative Review, 66 Fed. Reg. 20,425 (Apr. 23, 2001) ("Preliminary Results"). Commerce preliminarily determined that the three equity programs examined in the

3

review ((1) the GOB's purchases of Sidmar's common and preference shares in 1984, (2) the GOB's purchases of ALZ's common and preference shares in 1985, and (3) the GOB's 1985 debt-to-equity conversion) all constituted countervailable subsidies. Id. at 20,428-20,432. Commerce further preliminarily determined that ALZ and Sidmar had benefitted by an amount equal to the entire amount of the GOB's investments. Id. at 20,433. Commerce also determined that because ALZ is a fully consolidated subsidiary of Sidmar, any united subsidies provided to Sidmar were attributable to ALZ. Id. at 20,427.

On August 27, 2001, Commerce issued the Final Results that ALZ challenges in this action, determining the three equity programs under investigation to be countervailable subsidies and finding a final net subsidy rate of 3.25 percent *ad valorem* for the period September 4, 1998 through January 1, 1999, and 1.78 percent *ad valorem* for the period May 11, 1999 through December 31, 1999. Final Results, 66 Fed. Reg. at 45,009. Commerce established a cash deposit rate of 1.78 percent *ad valorem* for all entries of subject merchandise on or after August 27, 2001. Id.

**III**
**ANALYSIS**

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (1994) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) (1999).

A
Standard of Review

In reviewing a challenge to Commerce's final determination in a countervailing duty administrative review, the court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. §

4

1516a(b)(1)(B)(i) (1999). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S. Ct. 456, 95 L. Ed. 456 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).

Commerce's interpretation of the countervailing duty statute is "in accordance with law" if it comports with Congress's intention on the precise question at issue. Timex V.I., Inc. v. United States, 157 F.3d 879, 881-882 (Fed. Cir. 1998). If Congress's intention is not judicially ascertainable, this Court must consider whether Commerce's interpretation of the statute is reasonable in light of the overall statutory scheme. See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).

## B
## Applicable Legal Background

### 1
### Countervailing Duty Statute

To ascertain whether Commerce's determination is in accordance with law, this court first examines the law as set forth in the statute. The countervailing duty statute provides that Commerce must impose countervailing duties if it determines that a "government . . . or any public entity . . . is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States . . . ." 19 U.S.C. § 1671(a)(1) (1999).

A countervailable subsidy is conferred when a foreign government provides a financial contribution, for instance, an equity infusion, and a benefit is thereby conferred. See 19 U.S.C. §

1677(5)(B), (D) (1999). "A benefit shall normally be treated as conferred where there is a benefit to the recipient, including . . . in the case of an equity infusion, if the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made." 19 U.S.C. § 1677(5)(E)(i).

2
Commerce's Regulations

Commerce's regulations, mirroring the countervailing duty statue, provide that "[i]n the case of a government-provided equity infusion, a benefit exists to the extent that the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made." 19 C.F.R. § 351.507(a)(1) (2002).[2]

The regulations go on to provide Commerce with a methodology for determining when a government-provided equity infusion is inconsistent with usual investment practice. If private investor prices are available, an equity infusion is considered inconsistent with usual investment practice if the price paid by the government for newly issued shares is greater than the price paid by private investors for the same or similar form of newly issued shares. Id. at § 351.507(a)(2).

---

[2] Commerce's current regulations regarding countervailing duty methodology were adopted in November 1998. See Countervailing Duties, 63 Fed. Reg. 65,348 (Nov. 25, 1998) ("Preamble"). Commerce had not issued final rules prior to this date, but had issued proposed regulations in 1989. See Countervailing Duties (Notice of Proposed Rulemaking and Request for Public Comments), 54 Fed. Reg. 23,366 (May 31, 1989) ("1989 Proposed Regulations"). Because Commerce never issued final rules, the 1989 Proposed Regulations were not binding on either Commerce or private parties. Nevertheless, according to Commerce, "to some extent both the Department and private parties relied on the 1989 Proposed Regulations as a restatement of the Department's CVD methodology as it existed at the time." Preamble, 63 Fed. Reg. at 65,348.

If, however, private investor prices are unavailable, Commerce is confronted with an entirely different set of considerations. Commerce acknowledges that undertaking an analysis of government-provided equity infusions in situations in which there is no market benchmark price is one of the most difficult methodological problems the agency must confront in its administration of the countervailing duty law. See Countervailing Duties, 63 Fed. Reg. 65,348, 65,373 (Nov. 25, 1998) ("Preamble"). Since 1982, Commerce has dealt with this problem by categorizing firms as either "equityworthy" or "unequityworthy." Id. An equityworthy firm was one that showed "an ability to generate a reasonable rate of return within a reasonable period of time," while an unequityworthy firm failed to show such an ability. Id. If Commerce found a firm equityworthy, it would declare a government-provided equity infusion in the firm to not be countervailable; conversely, if Commerce found a firm unequityworthy, it would declare a government-provided equity infusion in the firm to be countervailable without further analysis. Id.

When it codified its new regulations, Commerce declared: "[W]e have retained the equityworthy/unequityworthy distinction." Id.[3] Thus, as it has in past practice in situations where private investor prices are not available, Commerce, in order to determine whether the infusion was consistent with usual investment practice, "will determine whether the firm funded by the government-provided equity was equityworthy or unequityworthy at the time of the equity infusion." 19 C.F.R. § 351.507(a)(3).

---

[3] The Preamble to Commerce's regulations also state that "notwithstanding statutory amendments made by the URAA and subsequent developments in the Department's administrative practice, the 1989 Proposed Regulations still serve as a point of departure for any new regulations dealing with CVD methodology." Preamble, 63 Fed. Reg. at 65,348.

Under the regulations as they are currently codified, Commerce "will consider a firm to have been equityworthy if the Secretary determines that, from the perspective of a reasonable private investor examining the firm at the time the government-provided equity infusion was made, the firm showed an ability to generate a reasonable rate of return within a reasonable period of time." 19 C.F.R. § 351.507(a)(4)(i). In determining equityworthiness, the regulations set out a permissive, non-exclusive list of factors Commerce may examine in making its determination. These factors include the following:

> (A) Objective analyses of the future financial prospects of the recipient firm or the project as indicated by, *inter alia*, market studies, economic forecasts, and project or loan appraisals prepared prior to the government-provided equity infusion in question;

> (B) Current and past indicators of the recipient firm's financial health calculated from the firm's statements and accounts, adjusted, if appropriate, to conform to generally accepted accounting principles;

> (C) Rates of return on equity in the three years prior to the government equity infusion; and

> (D) Equity investment in the firm by private investors.

Id. Commerce's regulations continue by noting the significance of a pre-infusion objective analysis. Specifically, the regulations state that for purposes of making an equityworthiness determination,

> the Secretary will request and normally require from the respondents the information and analysis completed prior to the infusion, upon which the government based its decision to provide the equity infusion. Absent the existence or provision of an objective analysis, containing information typically examined by potential private investors considering an equity investment, the Secretary will normally determine that the equity infusion received provides a countervailable benefit.

19 C.F.R. § 351.507(a)(4)(ii) (internal cross-references omitted).

C

The Government of Belgium's 1985 Purchase of ALZ Common and Preference Shares

In 1985, the GOB made three share subscriptions in ALZ: one subscription for common shares and two for preference shares. Preliminary Results, 66 Fed. Reg. at 20,428. These purchases followed Royal Decree No. 245 of December 31, 1983, which allowed the GOB to make preference share subscriptions in the steel industry under certain conditions. Id. ALZ, the GOB, and the Nationale Maatschappig voor de Herstructurering van de Nationale Sectoren ("NMNS"), the government agency purchasing the shares, signed an agreement with respect to these purchases on July 10, 1985.[4] Id. ALZ's shareholders approved these share acquisitions on September 26, 1985. Id.

> In its Original Determination, Commerce stated as follows:
>
> According to ALZ, the price at which the GOB purchased shares in ALZ was determined by two separate studies as discussed in ALZ's shareholders' meeting of September 26, 1985. These studies were performed by an independent accounting firm and a group of experts selected by ALZ. In addition, we have performed our own analysis of ALZ's financial health at the time of the stock purchase. This analysis indicates that the company was equityworthy. . . . Hence, we determine that the GOB's 1985 purchase of common shares was consistent with the usual investment practice of private investors in Belgium.

---

[4] Although the actual agreement between ALZ, the GOB, and the NMNS was signed on July 10, 1985, Commerce determined that GOB's decision to subscribe in ALZ's common and preference shares "appears to have been made as early as the date the GOB notified the EC of its intention to invest in ALZ, October 22, 1984." Memorandum from Team to Richard W. Moreland, Deputy Assistant Secretary for AD/CVD Enforcement, Government of Belgium Equity Infusions: 1984 Infusion in Sidmar, 1985 Infusion in ALZ, and the Conversion of Sidmar's Debt to Equity (OCPC-to-PB) in 1985 at 4-5 (Apr. 16, 2001) ("Preliminary Equity Memorandum"); Appendix Accompanying the Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Agency Record ("App.") Tab 20. Because "the amount of the subscriptions noted in the EC approval document did not change after the GOB notified the EC of its intentions," Commerce determined that "the actual GOB investment decision to invest in ALZ for both its common and preference shares was made on October 22, 1984." Id. at 5.

Original Determination, 64 Fed. Reg. at 15,570.  Regarding ALZ's preference shares, Commerce

> applied the standard established in Aimcor v. the United States, 871 F. Supp. 447, 454 (CIT 1994) and Geneva Steel et al. v. United States, 914 F. Supp. 563, 582 (CIT 1996) and analyzed the characteristics and the subscription price of the preference stock purchased by the GOB.  Although the record evidence [was] mixed, on balance, [Commerce] . . . determined that the terms at which the GOB ultimately purchased the preference shares was [sic] consistent with the usual investment practice of private investors in Belgium.

Id. (internal parentheticals and citations omitted).  Thus, Commerce originally determined that the GOB's decision to purchase ALZ's common and preference shares in 1985 did not constitute a countervailable subsidy.

Commerce explained that it had originally "analyzed whether the GOB's 1985 share purchases conferred a benefit on ALZ according to the equity methodology that was in place prior to the issuance of the Department's current subsidy regulations."  Preliminary Results, 66 Fed. Reg. at 20,428.  Commerce went on to state that it "re-initiated an investigation of these 1985 share subscriptions based on the change in [its] equity methodology from the time of the original investigation."  Id.  Under the new methodology required by its changed regulations, Commerce argues that it "places a greater emphasis on the objective analysis relied upon in making its decision to invest [than it] did in [its] prior practice."  Memorandum from Susan Kuhbach, Acting Deputy Assistant Secretary, Group I, to Joseph A. Spetrini, Acting Assistant Secretary for Import Administration, Issues and Decision Memorandum:  Final Results of First Countervailing Duty Administrative Review of Stainless Steel Plate in Coils from Belgium at 12 (Aug. 21, 2001) ("Decision Memorandum"); App. Tab 7.  The Government argues that Commerce is required to apply the current methodology, contained in the 1999 Regulations, to the administrative review at hand.  ALZ, however, argues that Commerce may not retroactively

apply a changed rule to facts that occurred prior to the rule's amendment.

1

Commerce's Retroactive Application of its Countervailing Duty Regulations to Conclude that the Government of Belgium's 1985 Purchase of ALZ Common and Preference Shares Constituted a Countervailable Subsidy is Not in Accordance with Law

"Retroactivity is not favored in the law." Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988). This presumption against retroactivity is

> deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal.

Immigration & Naturalization Serv. v. St. Cyr, 533 U.S. 289, 316, 121 S. Ct. 2271, 150 L. Ed. 2d 347 (2001) (citing Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 855, 110 S. Ct. 1570, 108 L. Ed. 2d 842 (1990) (Scalia, J., concurring) (internal quotations omitted)). "The inquiry into whether a statute operates retroactively demands a common sense, functional judgment about 'whether the new provision attaches new legal consequences to events completed before its enactment.'" Martin v. Hadix, 527 U.S. 343, 357-58, 119 S. Ct. 1998, 144 L. Ed. 2d 347 (1999) (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 270, 114 S. Ct. 1483, 128 L. Ed. 2d 299 (1994)). Specifically,

> [w]hen a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already

completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

Landgraf, 511 U.S. at 280. The general rule disfavoring retroactivity applies as well to administrative regulations. Shakeproof Assembly Components Division of Ill. Tool Works, Inc. v. United States, 102 F. Supp. 2d 486, 493 (CIT 2000) (citing Rhone Poulenc, Inc. v. United States, 14 CIT 364, 365 (1990) ("An administrative regulation will not be construed to have retroactive effect unless the language requires such a result.")); Bowen, 488 U.S. at 208 (stating that " a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms").

The statutory authority governing countervailing duties does not speak directly to whether Commerce can issue retroactive countervailing duty regulations. The only language in the regulations themselves that explicitly addresses the issue of when such regulations apply is the provision establishing the regulations' effective date. See 19 C.F.R. § 351.702(a)(1) (2002); Preamble, 63 Fed. Reg. at 65,348. That provision details that the regulations apply to "all CVD investigations initiated on the basis of petitions filed after December 28, 1998." 19 C.F.R. § 351.702(a)(1); see also Preamble, 63 Fed. Reg. 65,348, 65,348 (stating that "[t]he effective date of this final rule is December 28, 1998"). However, "[a] statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date." Landgraf, 511 U.S. at 257; Melex USA, Inc. v. United States,

19 CIT 1130, 1138 (1995).[5]  Furthermore, although Commerce decided to initiate an investigation of the three equity infusions by the GOB on October 19, 2000, the petitioners filed the original petition in this investigation on March 31, 1998, before the effective date of Commerce's amended regulations.  See Original Investigation, 64 Fed. Reg. at 15,567.  Thus, the plain language of the regulations, specifically section 351.702, directly speaks to the temporal reach of the regulations and requires that they be applied prospectively to investigations initiated on the basis of petitions filed after December 28, 1998.  Because that section contains an express command regarding the temporal reach of the countervailing duty regulations, the court must follow such language.

Even were there ambiguity surrounding the temporal reach of the 1999 Regulations, the presumption against retroactivity would counsel against such application in this case because application of the amended regulations to conduct occurring almost fifteen years before their amendment would arguably "impose new duties with respect to transactions already completed." Landgraf, 511 U.S. at 280.  Commerce's regulations, as they existed before the amendment, did not place a special emphasis on the existence of a pre-infusion analysis, particularly one assessing the risk versus expected return of the investment.  See Memorandum from Susan Kuhbach, Acting Deputy Assistant Secretary, to Joseph A. Spetrini, Acting Assistant Secretary for Import Administration, Issues and Decision Memorandum: Final Results of the First

_____

[5]  The Government argues that this court "has determined previously that 'the 1999 Regulations, by their terms, apply to countervailing duty investigations initiated after December 28, 1998.'" Defendant's Supplemental Brief Concerning the Doctrine of Res Judicata at 5 (citing Allegheny Ludlum Corp v. United States, ___ CIT ___, Slip Op. 01-87 (July 18, 2001). However, the plain language of the regulations states that they apply to "[a]ll CVD investigations initiated *on the basis of petitions filed after December 28, 1998*."  19 C.F.R. § 351.702(a)(1) (2002) (emphasis added).

Countervailing Duty Administrative Review of Stainless Steel Plate in Coils from Belgium at 12 (Aug. 21, 2001) (stating that under its prior practice, Commerce tended "to place a greater emphasis on past indicators as they are known with certainty and provide a clear track record of the company's performance, unlike studies of future expected performance which necessarily involve assumptions and speculation"). Under Commerce's practice before the 1999 Regulations, a foreign government seeking to make a non-countervailable equity investment would have focused on the past financial indicators of the company in which it was looking to invest, and would likely have discounted the importance of preparing objective analyses of future performance. After the amendment, however, Commerce has come to interpret its regulations as placing such a great emphasis on the existence on a pre-infusion objective analysis that a company, though earlier found equityworthy, cannot now be considered equityworthy without the existence of such an analysis. Not only is the application of the amendment in this case unfair, it effectively imposes new duties on a party (including the duty to prepare a pre-infusion objective analysis) with respect to transactions already completed. This type of retroactive application deprives parties of the opportunity to know what the rules are and to conform their conduct accordingly. By applying the current countervailing duty methodology to the GOB's equity investments, Commerce failed to act in accordance with law.

Accordingly, the court instructs Commerce, on remand, to apply the equityworthiness methodology in existence at the time the original petition in this investigation was filed.

D
Commerce's Determination that the Government of Belgium's 1984 Purchase of Sidmar Common and Preference Shares Constituted a Countervailable Subsidy is Not Supported by

Substantial Evidence or Otherwise in Accordance with Law

In 1984, the GOB made two share subscriptions (one for preference shares and the other for common shares) in Sidmar. Preliminary Results, 66 Fed. Reg. at 20,431. On January 13, 1984, the [various parties] executed a Memorandum of Understanding ("MOU") regarding the purchase of Sidmar's common and preference shares. See ALZ New Allegations Questionnaire Response, App. Tab 13 at exhibit 7c; see also Final Equity Memorandum, App. Tab 8 at 2, 4. In the MOU, the parties agreed, among other things, [to value Sidmar]. See  Final Equity Memorandum, App. Tab 8 at 2-3. On [an agreed date, a report regarding Sidmar's value was issued]. Id. at 3.

On April 27, 1984, NMNS, Sidmar, and the GOB signed an agreement committing to these share subscriptions. Id. On April 30, 1984, the GOB auditor issued its own report with respect to the share price valuations. Id. This report was derived from examinations of [two studies]. Id. On May 2, 1984, Sidmar's shareholders approved both the common share and the preference share increases, with the limitation that the share subscriptions had to be reviewed by the EC. Id. As a result of EC objections, the preference share transaction previously approved by the shareholders was nullified on September 25, 1984. Id. Sidmar shareholders approved a modified preference share subscription on October 16, 1984, and the original April 27, 1984 agreement between NMNS, Sidmar, and the GOB was modified in December 1984 to reflect the preference share subscription changes. Id.

Commerce determined that, with respect to the common share subscription, the GOB made its decision to invest at the time it entered into the January 13, 1984 MOU "because the

-15-

MOU stated [GOB's intentions]. Defendant's Mem. at 17; see also Preliminary Results, 66 Fed. Reg. at 20,431. Commerce explained that, although the final element of the transaction was ultimately not approved until October 16, 1984 (when the revised preference share agreement was adopted by the Sidmar shareholders), the amount of the infusion never changed after the MOU was signed. See Memorandum from Team to Richard W. Moreland, Deputy Assistant Secretary for AD/CVD Enforcement, Government of Belgium Equity Infusions: 1984 Infusion in Sidmar, 1985 Infusion in ALZ, and the Conversion of Sidmar's Debt to Equity (OCPC-to-PB) in 1985 at 3(Apr. 16, 2001) ("Preliminary Equity Memorandum"); App. Tab 20. Only the value of the shares, calculation of the number of shares, and the terms of the shares changed after that point. Id.

Regarding the preference share transaction, the MOU stated [GOB's intentions and Sidmar's response]. New Allegations Response, January 13, 1984 Memorandum of Understanding, attached as Exhibit 7c to the 1993 Report of the Verification of Sidmar N.V., App. Tab 13 at 2. Based on this language, Commerce determined that April 27, 1984, the date of the agreement between the GOB and Sidmar, was the point in time at which the GOB decided to purchase Sidmar's preference shares. See Final Equity Memorandum, App. Tab 8 at 4. The April 27, 1984 agreement stated that the GOB [would take certain actions]. Id.

After deciding that the MOU represented the date the GOB made the decision to invest in Sidmar, Commerce proceeded to determine that the [second] study, "the only study performed prior to the GOB's decision to invest in Sidmar," was not sufficient to allow the GOB to evaluate the potential risk versus the expected return in its investment in Sidmar. Id. Based on this information, Commerce concluded that the analyses did not contain information typically

-16-

examined by potential private investors considering an equity investment and that the GOB's purchases of Sidmar's common and preference shares in 1984 thus constituted a countervailable subsidy. Id.

ALZ contests two of Commerce's conclusions regarding the GOB's 1984 equity investment in Sidmar. First, ALZ charges that Commerce determined a date of sale for the common shares (the date the decision to invest was made) that was not supported by substantial evidence on the record. Second, ALZ contends that Commerce applied a standard not found in its regulations or its practice in order to determine that no adequate objective analyses existed.

1

Commerce's Determination that the Government of Belgium's Decision to Invest in Sidmar's Common Shares Was at the Time the Memorandum of Understanding was Signed is Not Supported by Substantial Evidence or Otherwise in Accordance with Law

Commerce, throughout the proceedings, and the Government here, argue that the statement in the MOU that [GOB's intentions regarding ] was dispositive of the decision to purchase shares "because the amount of the equity infusion the GOB was planning to make never changed after the MOU was signed." Defendant's Mem. at 20; Final Equity Memorandum, App. Tab 8 at 4. Commerce's determination, which appears to hinge on [a] single word [" "] in the preamble of the MOU, is not supported by substantial evidence on the record or otherwise in accordance with the law.

On its face, the MOU does not commit the GOB to purchase Sidmar shares; neither does it commit Sidmar to issue new shares. It simply reflects that the GOB was in the preliminary stages of negotiating a possible investment in Sidmar. At the time the MOU was signed, the

-17-

value of the shares, quantity of shares, and the "terms" of the shares were not set; these all changed after the date of the MOU. See id. at 4.

There does exist binding language in the MOU. Specifically, on the third page of the MOU, the parties [agree to take certain actions]:

WHEREFOR

the parties agree as follows:

* * *

2. [To take certain actions to value Sidmar][6]

New Allegations Response, January 13, 1984 Memorandum of Understanding, attached as Exhibit 7c to the 1993 Report of the Verification of Sidmar N.V., App. Tab 13 at 3. This language indicates two things. First, where the parties chose to signify and affirm a binding agreement, by using the specific language "the parties agree," they knew how to do so. Commerce found this same type of language indicative of a decision to purchase shares when it analyzed the point in time the GOB decided to invest in Sidmar's preference shares. See Final Equity Memorandum, App. Tab at 4 (determining that the April 27, 1984 agreement, in which the GOB [agrees to take certain actions] constituted a binding agreement to invest).

What most undercuts Commerce's argument, however, is the semantic inconsistencies presented by its interpretation of the MOU. To conclude that [a phrase written in active voice] is dispositive of a decision to invest while [a phrase in the passive voice] is not, focuses on a purely semantic distinction. Under ordinary principles of contract law, one construes a contract in terms

---

[6] The original MOU is not in the record before this court; a translation by Sidmar, however, was included.

of the parties' intent, as revealed by the language and circumstance. United States v. Winstar Corp., 518 U.S. 839, 911, 116 S. Ct. 2432, 135 L. Ed. 2d 964 (1996). Because the MOU does not define its own binding nature as a document, the intent of the parties, as manifested in the language of the MOU, is critical in determining whether or not the MOU constitutes a binding commitment to invest. Despite this fact, Commerce did not compare the difference between these two phrases in the original version of the MOU; instead, it relied upon the translation provided by Sidmar. Without further evidence that the GOB's plans or considerations about investing in Sidmar were transformed into a binding decision to invest, Commerce's determination that the MOU alone constituted a binding decision to invest is not supported by substantial evidence or otherwise in accordance with law. On remand, Commerce is instructed to more closely scrutinize the terms of the MOU to determine whether such document indicates a binding decision to invest and to reexamine the record for any additional evidence regarding the date upon which the GOB decided to invest in Sidmar's common shares. Commerce shall also explain its reasoning for choosing the date it finds to be the date the GOB decided to invest.

E
Commerce's Decision That the Studies Conducted with Respect to the Government of Belgium's 1984 Purchase of Common and Preference Sidmar Shares and 1985 Debt-to-Equity Conversion into Sidmar Do Not Constitute Adequate Objective Analyses is Not Supported by Substantial Evidence or Otherwise in Accordance With Law

During its review of the GOB's 1984 Sidmar equity infusion, Commerce determined that there were two outside studies on the record. See Final Equity Memorandum, App. Tab 8 at 4.

-19-

The first outside study of Sidmar was dated April 14, 1983, prior to the GOB's decision to make the common and preference share subscriptions. Id. This study was a "substantial" evaluation of Sidmar's tangible and fixed assets, and stocks, prepared by a private accounting firm, [name of firm], at the request of Sidmar's general management. See April 14, 1983 Study, App. Tab 19. Commerce found the analysis contained in the April 14, 1983 study inadequate because it did not "provide the type of information that would be used by a private investor in evaluating the risk and return of the investment being considered, e.g., Sidmar's future viability or future prospects." Final Equity Memorandum, App. Tab 8 at 4. This finding was based on Commerce's position that a "private investor would require information 'sufficient to determine the expected risk-adjusted return and how such a return compares to that of alternative investment opportunities of similar risk.'" Id. at 3 (citing Preamble, 63 Fed. Reg. at 65,373).

The second outside study was a [date] study, performed pursuant to the MOU. See id. at 4; see also [date] Study, App. Tab 22. This study was conducted by a group of experts selected by the parties to the MOU to determine the value of Sidmar. Commerce determined that this study also failed to provide an adequate analysis, because it did not provide the type of information that would be used by a private investor, including an evaluation of investment risk. Id. at 4-5. Specifically, Commerce stated, "In particular, while this study does project future profitability and earnings for Sidmar, there is no explanation or support for these projections." Id. at 4.

The Government argues that

Commerce's determination that the GOB did not possess adequate information upon which to make a commercially sound decision is in accord with Commerce's preamble to its countervailing duty regulations, which provides, in pertinent part, that

-20-

prior to making a significant equity infusion, it is the usual investment practice of a private investor to evaluate the potential risk versus the expected return, using the most objective criteria and information available to the investor. This includes an analysis of information sufficient to determine the expected risk-adjusted return and how such a return compares to that of alternative investment opportunities of similar risk. Absent such an objective analysis – performed prior to the equity infusion – it is unlikely that we would find that the infusion was in accordance with the usual investment practice of a private investor, except where we are satisfied that the lack of such an analysis is consistent with the actions of a reasonable private investor in the country.

Defendant's Mem. at 19-20 (citations omitted).

For the reasons articulated above, Commerce's reliance on a standard created after the petition in this case was filed to find the GOB's investments countervailable is not in accordance with law. Commerce's 1989 Proposed Regulations did not require Commerce to place a special emphasis on the existence of a pre-infusion objective analysis. Requiring such a study now in order to find the infusions non-countervailable is an impermissible retroactive application of Commerce's regulations.

F
Commerce's Conclusion that the 1985 Conversion of Sidmar's Debt to Equity Constituted a Countervailable Subsidy is Not Supported by Substantial Evidence or Otherwise in Accordance with Law

Between 1979 and 1983, the GOB assumed the interest costs associated with medium- and long-term loans for certain steel producers, including Sidmar. See Preliminary Results, 66 Fed. Reg. at 20,432. In exchange for the GOB's assumption of financing costs, Sidmar agreed to the conditional issuance of convertible profit sharing bonds ("OCPCs") to the GOB. Id. In 1985, Sidmar and the GOB agreed to substitute parts beneficiaires ("PBs") for the OCPCs. Id.

In the Original Determination, Commerce found that: (1) The GOB's initial assumption

-21-

of interest costs were specific under section 771(5A) of the Act; (2) the OCPCs were properly classifiable as debt and that the conversion of OCPCs to PBs constituted a debt-to-equity conversion; and (3) based on a comparison of the price paid for the PBs to an adjusted market value of Sidmar's common stock, the debt-to-equity conversion provided a benefit to Sidmar because the share transactions were on terms inconsistent with the usual practice of a private investor. Id. On these bases, Commerce originally determined that the program constituted a countervailable subsidy. Id.

Upon re-examination of the debt-to-equity conversion, Commerce, as it did with the other two equity investments at issue, focused its analysis on the existence of an objective analysis. See Preliminary Equity Memorandum, App. Tab 20 at 4. Commerce determined that "no objective studies of Sidmar, containing information typically examined by potential private investors considering an equity investment, had been prepared prior to the GOB's investment decision on which the GOB could have based its decision to participate in the debt-for-equity conversion." Preliminary Results, 66 Fed. Reg. 20,432. Commerce found that there were four outside studies of Sidmar on the record: the first, performed in 1983, was discussed in connection with the 1984 share purchases; the second was prepared in 1984; the final two, prepared in April and September 1984, were performed by Sidmar's statutory auditor and were based on the two earlier studies. Preliminary Equity Memorandum, App. Tab 20 at 4.

Commerce found that the "1983 study does not contain the type of information a private investor would rely upon in making a decision to invest," specifically

> information "sufficient to determine the expected risk-adjusted return and how such a return compares to that of alternative investment opportunities of similar risk" (see Preamble to the Department's Countervailing Duty Regulations, 63 FR 65373).

Id. at 4. In analyzing this study, Commerce relied on the standard found in the Preamble, as it did in connection with the studies related to the GOB's 1984 purchase of Sidmar's common and preference shares. Specifically, Commerce found that the study did not provide information that a private investor would require because it did not contain information about the expected risk-adjusted return and how such a return compares to that of other investment opportunities. For the reasons articulated above, Commerce's reliance on a standard found in the Preamble to the 1999 Regulations is not in accordance with law.

> Commerce determined that the remaining three studies, performed in 1984,
>
> were prepared in connection with the GOB's 1984 purchase of Sidmar's preference shares and appear, at best, to provide some support for the prices paid for the preference shares. However, the studies do not address the 1985 investment, in particular the terms of the PBs, the likelihood that such returns would materialize, or other investments having a similar level of risk.

Id. Thus, Commerce rejected the remaining studies because they were prepared in conjunction with the 1984 transactions and did not address the 1985 investment. By doing so, Commerce required that the studies both (1) be prepared for the particular transaction at issue, and (2) provide an analysis of other investment options. These requirements are not in accordance with Commerce's past practice.

In Preliminary Affirmative Countervailing Duty Determination and Preliminary Negative Critical Circumstances Determination: Carbon and Certain Alloy Steel Wire Rod from Trinidad and Tobago, 67 Fed. Reg. 6,001 (Feb. 8, 2002) ("Wire Rod from Trinidad and Tobago"), Commerce investigated allegations that the Government of Trinidad and Tobago's ("GOTT") equity infusions into the Iron and Steel Company of Trinidad and Tobago ("ISCOTT") constituted countervailable subsidies. Commerce had analyzed payments made by the GOTT to

ISCOTT dating back to 1983. Previously, in <u>Final Affirmative Countervailing Duty Determination: Steel Wire Rod from Trinidad and Tobago</u>, 62 Fed. Reg. 55,003, 55,005 (Oct. 22, 1997) ("1997 Trinidad and Tobago Wire Rod"), Commerce determined that payments made by the GOTT to ISCOTT from June 13, 1984 through December 31, 1991 were not consistent with the practice of a reasonable private investor and were thus countervailable subsidies. <u>Id.</u> Commerce, however, also found that payments or advances made *after* December 31, 1991 were consistent with the practice of a reasonable private investor. <u>Id.</u>

Based on the change in its equity methodology, Commerce initiated an investigation of certain payments and advances and reexamined its previous determinations, including its determination regarding that countervailable subsidies existed during the period April 9, 1988 through December 31, 1991. "[B]ecause no new evidence ha[d] been submitted that would change [its earlier] determination," Commerce did not alter its previous determination "that GOTT equity infusions received by ISCOTT from January 1, 1986 through April 8, 1988 [were] countervailable subsidies." Wire Rod from Trinidad and Tobago, 67 Fed. Reg. at 6,006. Furthermore, regarding the GOTT equity infusions into ISCOTT during the period April 9, 1988 through December 31, 1991, Commerce determined that "the respondents ha[d] not provided any information that was not already closely examined in 1997 Trinidad and Tobago Wire Rod" and therefore consistent with 1997 Trinidad and Tobago Wire Rod, Commerce determined that the equity infusions were countervailable subsidies. <u>Id.</u>

In analyzing the equity infusions made by the GOTT between January 1, 1992 and December 31, 1994, Commerce explained that it had "conducted an extensive review of ISCOTT and CIL's [Caribbean Ispat Limited, the only producer/exporter of carbon and certain alloy steel

-24-

wire rod in Trinidad and Tobago] internal documents, financial projections, and historical financial data in 1997 Trinidad and Tobago Wire Rod," and the agency used this information in analyzing the 1992 to 1994 equity infusions. Id. The evidence relied on by Commerce, in both 1997 Trinidad and Tobago Wire Rod and its investigation of the equity infusions made between 1992 and 1994, were outside studies commissioned by the GOTT between 1983 and 1989 "to determine the financially preferable course of action for ISCOTT." Id. These studies "focused on the need for ISCOTT and the GOTT to take steps to improve ISCOTT's operations and the management of ISCOTT." Id. One study, for instance, the August 1987 International Finance Corporation ("IFC") report, "analyzed ISCOTT's position at the time and its future prospects, and concluded that several options, such as leasing the plant to an outside party, were possible to make ISCOTT's operations viable." Id. After the 1987 study, the GOTT formed an outside committee to negotiate a lease for ISCOTT. This committee, and another outside committee created to review the findings of the first committee, agreed with the IFC study that leasing the ISCOTT property was the preferred option to make ISCOTT viable. Id. The studies from the two outside committees were completed in late 1987 and early 1988. Id. Commerce determined that the studies provided a sound basis for the GOTT to invest in ISCOTT from January 1, 1992 through December 31, 1994, and that the investments were thus consistent with the actions of a reasonable private investor. Id.

In determining that studies on how to restructure ISCOTT, undertaken from 1983 through 1988, were adequate to support equity infusions by the GOTT from 1992 through 1994, Commerce relied on studies that were neither conducted for the purpose of the investments at issue, nor contemporaneously produced. Because they were conducted prior to ISCOTT's

-25-

restructuring, for the purposes of that restructuring, such studies could not have considered or analyzed the GOTT's investment options in other companies.

Wire Rod from Trinidad and Tobago makes two points relevant here. First, that Commerce will rely on its past determinations if "no new evidence is submitted that would change its earlier determination." Second, Commerce has found studies adequate even if they contained no analysis of other investment options and were not contemporaneously conducted, but instead were conducted for a different purpose five years prior to the initial equity investment at issue. Commerce's decision here to treat Sidmar's studies as inadequate represents a departure from its prior practice as articulated in Wire Rod from Trinidad and Tobago. Thus, Commerce's decision requires a more persuasive explanation than provided in the agency's determinations.

F
Commerce's Decision that the Entire Amount of the Investments at Issue Could Constitute a Countervailable Benefit is in Accordance with Law

In its Decision Memorandum, Commerce stated that in the absence of an objective analysis, it would determine "that the company receiving the government's equity infusion is receiving a benefit in the amount of the infusion." Decision Memorandum, App. Tab 7 at 11. Consequently, based on its finding that there was no evidence that the GOB had relied on an objective analysis in deciding to make its investments in Sidmar and ALZ in 1984 and 1985, Commerce determined that the entire amount of the equity infusions constituted a benefit. Id. at 13.

ALZ argues that Commerce should not have determined that the entire amount of the investments at issue provided a benefit to ALZ and Sidmar because Commerce failed to measure

the benefit to these recipients and ignored record evidence that both companies were financially sound companies from which any investor could expect a return on its investments.

In calculating the benefit to the recipient firm, Commerce's regulations state that, where Commerce determines that a firm is unequityworthy, "a benefit to the firm exists in the amount of the equity infusion." 19 C.F.R. § 351.507(a)(6). This rule is a codification of Commerce's long-standing practice, which has been upheld by this court in British Steel PLC v. United States, 19 CIT 176 (1995) (stating that Commerce's methodology "provides a reasonable method of allocating the value of subsidy benefits from the bestowal of equity infusions into unequityworthy companies"), *aff'd in part and rev'd in part*, 127 F.3d 1471 (Fed. Cir. 1997). See also Usinor Sacilor v. United States, 893 F. Supp. 1112, 1125-26 (CIT 1995). In the case of an unequityworthy firm, it is reasonable to assume that no private investor would invest in such firm. Commerce's regulations thus compare what the firm actually received with what the firm would have received absent the government infusion. It is therefore reasonable to consider the full amount of the infusion as the benefit because the government, by providing an equity infusion, provided a sum of money that would not have been provided by a private investor. Therefore, if after a meaningful analysis on remand, Commerce determines that ALZ and Sidmar were unequityworthy at the time the GOB decided to invest on those firms, Commerce is required, pursuant to its regulations, to countervail the entire amount of the benefit.

G
Commerce's Decision Not to Adjust the Cash Deposit Rate Based on ALZ's Failure to Provide Evidence of a Program-Wide Change is Supported by Substantial Evidence and in Accordance with Law

In an administrative review of a countervailing duty order, Commere is required to instruct the United States Customs Service ("Customs") to collect a cash deposit of estimated countervailing duties at the rate determined by Commerce's final determination. See 19 C.F.R. § 351.211(b)(2) (2002). Cash deposits collected by Commerce are an estimate of the benefit accruing to future entries from subsidies found in the course of an administrative review. In establishing the cash deposit rate, Commerce may take a program-wide change into account if Commerce determines that, subsequent to the period of review, but before a preliminary result of an administrative review, a program-wide change has occurred and Commerce is able to measure the change in the amount of countervailable subsidies provided under the program in question. See 19 C.F.R. § 351.526(a) (2002). A "program-wide change" is defined as "a change that (1) [i]s not limited to an individual firm or firms; and (2) [i]s effectuated by an official act, such as the enactment of a statute, regulation, or decree, or contained in the schedule of an existing statute, regulation, or decree." 19 C.F.R. §351.526(b). This provision allows Commerce to adjust the cash deposit rate to reflect the termination of programs that have no lingering benefits. Commerce, however, will not adjust the cash deposit rate if the program-wide change consists of the termination of a program and Commerce determines that residual benefits may be continued to be bestowed under the terminated program. 19 C.F.R. § 351.526(d)(1).

Although it is uncontroverted that, after 1999, no benefit accrued from either the GOB's 1984 equity infusion into Sidmar or its 1985 equity infusion into ALZ, Commerce did not adjust the cash deposit rate for entries after August 27, 2001 to reflect a program-wide change. Commerce refused to adjust the cash deposit rate because, it said, ALZ did not provide any documentation supporting such a change. See Decision Memorandum, App. Tab 7 at 16-17.

Commerce regularly requires direct evidence of a program-wide change in a subsidy program before it adjusts the cash deposit rate. See Final Results and Partial Rescission of Countervailing Duty Administrative Review: Stainless Steel Sheet and Strip in Coils From the Republic of Korea, 67 Fed. Reg. 1,964 (Jan. 15, 2002), and accompanying decision memorandum at Comment 2 (stating that § 351.526(b)(2) of the regulations require a program-wide change be effectuated by an official act, such as a statute, regulation or decree, and respondents' presentation of newspaper articles of a sale was not direct evidence of an official act and therefore insufficient to uphold section 351.526(b)(2) of the regulations); see also Notice of Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Determination With Final Antidumping Duty Determination: Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) From India, 66 Fed. Reg. 53,389, 53,393 (Oct. 22, 2001) (declining to grant program-wide change based government's indication that program was abolished absent legislation "to substantiate the termination of this program" and declaring that if Commerce could substantiate during verification that such a program-wide change had occurred, it would adjust the cash deposit rate to reflect the termination); see also Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products From India, 66 Fed. Reg. 49,635 (Sept. 28, 2001) and accompanying decision memorandum at Comment 7 (responding to petitioners argument that a government policy circular is not an adequate basis to warrant finding of program-wide changes by stating that, consistent with past practice, policy circulars and sections of government's export-import policy handbook that indicated that subsidy programs had been abolished was sufficient evidence on the record to warrant application of program-wide changes).

ALZ argues that "[b]ecause the equity infusions at issue were not part of a program *per se*, as the Department is aware, it is impossible for the responding parties to provide any such evidence." Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Agency Record ("Plaintiff's Mem.") at 27. Because there is no law or decree creating a program, ALZ argues, there can be no law or decree terminating it.

Here, the plain language of Commerce's regulations controls. Section 351.526(b) enumerates two requirements in order for Commerce to adjust the cash deposit rate based on a program-wide change: first, the change must not be limited to an individual firm or firms; second, the change must be implemented by an official act. Here, there is no evidence that a change applied to more than a single firm or firms or that an official act has implemented such change.

Although ALZ points to a single case in which Commerce adjusted the cash deposit rate where there was not a program-wide change, its argument is unpersuasive. In <u>Pure Magnesium and Alloy Magnesium from Canada</u>, 57 Fed. Reg. 30,946 (July 13, 1992) ("Pure Magnesium from Canada"), Commerce adjusted the cash deposit rate because it determined that the recipient firm had repaid a grant and would not use the program in the future. <u>Id.</u> at 30,946. Commerce did not make a program-wide change determination; rather, Commerce declined to include the funds received by the firm in the cash deposit rate because the firm reimbursed the government and would not receive any more assistance under that program. The facts there are not sufficiently similar to those here to mandate the same result. Absent any other legal authority requiring Commerce to adjust the cash deposit rate, Commerce's decision not to adjust the rate on the basis that ALZ provided no evidence of a program-wide change is supported by

substantial evidence and in accordance with law.

## IV

## CONCLUSION

Based on the reasons set forth above, the court remands this matter to Commerce so that it may conduct further proceedings consistent with this opinion. The remand results are due within 60 days from the date of this opinion; ALZ shall have 30 days thereafter within which to file comments; and Commerce may reply to any such comments within 11 days of their filing.

_____
Evan J. Wallach, Judge

Date:   July 11, 2003
        New York, New York