**Slip Op. 06-54**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **PARKDALE INTERNATIONAL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **RUSSEL METALS EXPORT,** ) | |
| ) | **Before: Barzilay, Judge** |
| **Plaintiff-Intervenor,** ) | **Court No. 05-00316** |
| ) | |
| **v.** ) | |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| **Defendant,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **UNITED STATES STEEL CORP.,** ) | |
| ) | |
| **Defendant-Intervenor.** ) | |

**OPINION**

[Plaintiff's motion for summary judgment on agency record is denied].

April 17, 2006

*Hunton & Williams LLP* (*William Silverman*), *Richard P. Ferrin*, for the plaintiff.

*Sharretts, Paley, Carter & Blauvelt, P.C.* (*Peter Jay Baskin*, *Beatrice A. Brickell*), for the plaintiff-intervenor.

*Peter D. Keisler*, Assistant Attorney General; *David Cohen*, Director; (*Jeanne E. Davidson*), Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, (*David S. Silverbrand*); *Kemba Eneas*, International Trade Administration, Department

of Commerce, of counsel, for the defendant.

     *Skadden Arps Slate Meagher & Flom LLP* (*John J. Mangan*), *Robert E. Lighthizer, Jeffrey D. Gerrish, Stephen F. Munroe*, for the defendant-intervenor.


     BARZILAY, Judge:    Plaintiff, Parkdale International, a reseller, exporter and importer of corrosion-resistant carbon steel products ("CORE") from Canada to the United States, moves for judgment on the agency record pursuant to USCIT Rule 56.2, seeking review of the final results in *Certain Corrosion-Resistant Carbon Steel Flat Products from Canada*, 70 Fed. Reg. 13,458 (Dep't Comm., Mar. 21, 2005) (hereinafter "Final Results"), *as amended by* 70 Fed. Reg. 22,846 (Dep't Comm., May 3, 2005). Specifically, Plaintiff and Plaintiff-Intervenor, Russel Metals Export ("Russel"), a Canadian reseller of CORE, challenge the Department of Commerce's instructions to the Bureau of Customs and Border Protection ("Customs"), based on Commerce's new unreviewed reseller policy rule published on May 6, 2003, to liquidate, at the "all-others" rate, entries of subject merchandise entered prior to May 6, 2003. The court exercises jurisdiction over this case pursuant to 28 U.S.C. § 1581(c) to review Commerce's antidumping determination made under 19 U.S.C. § 1516a(b)(1) and 19 U.S.C. § 1675.

## I.  BACKGROUND

     Commerce first published its antidumping duty order on CORE from Canada on August 19, 1993. *Antidumping Duty Orders: Certain Corrosion-Resistant Carbon Steel Flat Products from Canada*, 58 Fed. Reg. 44,162 (Dep't Comm., Aug. 19, 1993). On October 15, 1998, Commerce published a notice in the Federal Register announcing that it intended to clarify its

regulation 19 C.F.R. §351.212[1] regarding the automatic liquidation of entries subject to an

antidumping duty order where a reseller exports subject merchandise to the United States.  *See*

*Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties*, 63 Fed.

Reg. 55,361 (Dep't Comm., Oct. 15, 1998) (notice and request for comment).  On March 25,

2002, Commerce asked for additional comments on the October 15, 1998 proposal.  *See*

*Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties;*

*Additional Comment Period*, 67 Fed. Reg. 13,599 (Dep't Comm., Mar. 25, 2002).  Parkdale

submitted comments on April 1, 2002 and Russel supported Parkdale's views.  *See Issues and*

*Decision Memorandum for the Final Results of the Administrative Review of the Antidumping*

*Duty Order on Certain Corrosion-Resistant Carbon Steel Flat Products from Canada*, at 10

(Mar. 14, 2005), P.R. 154 (hereinafter "Issues and Decision Mem.").  After receiving and

---

[1]The regulation to be clarified, 19 C.F.R. §351.212(c), provides:
(c) Automatic assessment of antidumping and countervailing duties if no review is requested.
(1) If the Secretary does not receive a timely request for an administrative review of an order (see paragraph (b)(1), (b)(2), or (b)(3) of § 351.213), the Secretary, without additional notice, will instruct the Customs Service to:
(i) Assess antidumping duties or countervailing duties, as the case may be, on the subject merchandise described in § 351.213(e) at rates equal to the cash deposit of, or bond for, estimated antidumping duties or countervailing duties required on that merchandise at the time of entry, or withdrawal from warehouse, for consumption; and
(ii) To continue to collect the cash deposits previously ordered.
(2) If the Secretary receives a timely request for an administrative review of an order (see paragraph (b)(1), (b)(2), or (b)(3) of § 351.213), the Secretary will instruct the Customs Service to assess antidumping duties or countervailing duties, and to continue to collect cash deposits, on the merchandise not covered by the request in accordance with paragraph (c)(1) of this section.
(3) The automatic assessment provisions of paragraphs (c)(1) and (c)(2) of this section will not apply to subject merchandise that is the subject of a new shipper review (see § 351.214) or an expedited antidumping review (see § 351.215).

reviewing comments, Commerce published a notice officially implementing its unreviewed-reseller procedure on May 6, 2003. *Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties*, 68 Fed. Reg. 23,954 (Dep't Comm., May 6, 2003) ("Reseller Policy"). The Reseller Policy, characterized by Commerce as a "clarification" of the duty assessment procedure for unreviewed resellers, states:

> [A]utomatic liquidation at the cash-deposit rate required at the time of entry can only apply to a reseller which does not have its own rate if no administrative review has been requested, either of the reseller or of any producer of merchandise the reseller exported to the United States. If the Department conducts a review of a producer of the reseller's merchandise where entries of the merchandise were suspended at the producer's rate, automatic liquidation will not apply to the reseller's sales. If, in the course of an administrative review, the Department determines that the producer knew, or should have known, that the merchandise it sold to the reseller was destined for the United States, the reseller's merchandise will not be liquidated at the assessment rate the Department determines for the producer or automatically at the rate required as a deposit at the time of entry. In that situation, the entries of merchandise from the reseller during the period of review will be liquidated at the all-others rate if there was no company-specific review of the reseller for that review period.

68 Fed. Reg. 23,954. The new policy applies to entries "for which the anniversary month for requesting an administrative review" is May 2003 or later. *Id.* at 23,956.

For the period of review at issue, August 1, 2002, through July 31, 2003, Commerce published, on August 1, 2003, a notice of opportunity to request an administrative review of antidumping and countervailing duty orders, including the antidumping duty order on CORE from Canada. *Antidumping or Countervailing Duty Order, Finding, or Suspended Liquidation; Opportunity to Request Administrative Review*, 68 Fed. Reg. 45,218 (Dep't Comm., Aug. 1, 2003) (stating that interested parties would have opportunity during August 2003 to request

administrative review of antidumping duty order on CORE from Canada). Parkdale did not request such a review.

On September 13, 2004, Commerce published the preliminary results of its administrative review of CORE products from Canada for the period August 1, 2002, through July 31, 2003. *Certain Corrosion-Resistant Carbon Steel Flat Products from Canada*: *Preliminary Results of Antidumping Duty and Administrative Review*, 69 Fed. Reg. 55,138 (Dep't Comm., Sept. 13, 2004) ("Preliminary Results"). In this notice, Commerce stated that the Reseller Policy "will apply to entries of subject merchandise during the period of review produced by companies included in these final results of review for which the reviewed companies did not know their merchandise was destined for the United States" and that accordingly, Commerce would instruct Customs "to liquidate unreviewed entries at the 'all-others' rate if there is no rate for the intermediate company(ies) involved in the transaction." *Id.* at 55,142. Commerce issued draft liquidation instructions for entries of CORE from Canada reflecting this intention. P.R.[2] 140.

Parkdale responded to this administrative review, arguing that liquidation of its entries entered prior to May 6, 2003, at the "all-others" rate would constitute an unlawful retroactive application of the Reseller Policy and that Commerce should instead apply the cash deposit or bonding rate as it had prior to the new rule. P. R. 140. Commerce declined to adopt Parkdale's arguments and published Final Results on March 21, 2005. *Final Results*, 70 Fed. Reg. 13,458. Prior to this determination, Parkdale's CORE imports had been subject to a cash deposit rate of

---

[2]"P.R." is an abbreviation for the Public Records in the review initiated by Russel and the numbers following "P.R." correspond to the "Index to Administrative Record" numbers transmitted by Commerce to the court for this case.

4.24 percent. The applicable "all-others" rate for Parkdale's entries was 18.71 percent. *Issues and Decision Mem.* at 8.

Unlike Parkdale, Russel initially requested a review of its exports of subject merchandise. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews, Request for Revocation in Part and Deferral of Administrative Review*, 68 Fed. Reg. 56,262 (Sept. 30, 2003). On November 7, 2003, Commerce sent an antidumping duty questionnaire to Russel. Def.'s Resp. 5. On September 9, 2003, Russel, along with several other Canadian resellers that requested administrative review, discussed with Commerce the application of the Reseller Policy. *See Mem. Sept. 9, 2003 Meeting with Canadian Industry and Government Representatives*, P.R. 13. The Canadian resellers informed Commerce that they would be unable to provide the Cost of Production/Constructed Value (COP) information normally requested in Section D of the standard antidumping questionnaire. *See Letter from Russel to Commerce*, P.R. at 39. Russel advised Commerce that the starting point for providing cost information in the questionnaire response must be the acquisition price from the Canadian producer of the steel. *Letter from Russel to Commerce*, P.R. at 39. Subsequently, Russel submitted a letter dated November 21, 2003, to Commerce asking that it be allowed to calculate production costs based on its acquisition costs instead of mill production costs. *See Letter from Russel to Commerce*, P.R. 39. In that letter, Russel stated that it "reasonably believes that the DOC [Department of Commerce] will conclude that its vendors did not know that the subject merchandise sold to Russel was destined to the U.S. at the time of sale." *Letter from Russel to Commerce*, P.R. 39. Russel also asked for an extension from the original due date of December 23, 2003 for submitting its

responses to the questionnaire. *Letter from Russel to Commerce*, P.R. 39. However, on December 24, 2003, Russel withdrew its request for an administrative review. Prior to receiving Russel's withdrawal, on December 29, 2003, Commerce sent a reply to Russel's letter dated November 21, 2003, granting Russel an extension until January 12, 2004, and advising that Russel should respond to the questionnaire to the best of its ability. *Letter from Commerce to Russel*, P.R. 48. Commerce contacted Russel after receiving Russel's withdrawal letter, and Russel confirmed that it wanted to withdraw from the review. *Issues and Decision Mem.*, A.R. Pub. Doc. 154.

After Commerce issued its Final Results, Plaintiff filed this action, challenging Commerce's application of the Reseller Policy to its entries of CORE from Canada made during the period August 1, 2002, through July 31, 2003. Parkdale argues that the new rule should not be applied to any entries made before May 6, 2003, by manufacturers, producers, or exporters for which the Department did not conduct an administrative review. It challenges Commerce's application of the new rule to its pre-May 6, 2003 entries as impermissibly retroactive and, therefore, not in accordance with law under 19 U.S.C. § 1516a(b)(1)(B). Russel supports this position and further claims that Commerce failed to provide it with practicable assistance under 19 U.S.C. § 1677m(c) during the administrative review.

## II. STANDARD OF REVIEW

This court "must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance

with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

In this case, Plaintiff does not claim that the Reseller Policy is by its terms unlawful, but challenges Commerce's application of the new rule as impermissibly retroactive. Thus, at issue is Commerce's decision to apply the new rule to entries that were made prior to the rule's effective date. "It is well established 'that an agency's construction of its own regulations is entitled to substantial deference.'" *Martin v. Occupational Safety and Health Rev. Comm'n*, 499 U.S. 144, 150 (1991) (quoting *Lyng v. Payne*, 476 U.S. 926, 939 (1986)). When an agency is authorized to engage in notice-and-comment rulemaking, substantial deference is afforded to that agency's reasonable interpretation of its regulations. *See United States v. Mead Corp.*, 533 U.S. 218, 230-231 (2001); *Lee v. United States*, 329 F.3d 817, 822 (Fed. Cir. 2003) (stating that "a great amount of deference is owed to an agency's interpretation of its own regulations").

However, "a statutory grant of legislative rulemaking authority will not encompass the power to promulgate retroactive rules unless that power is expressly conveyed by Congress." *California Indus. Products. Inc. v. United States*, 28 CIT __, __, 350 F. Supp. 2d 1135, 1142 (2004) (citing *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 24 CIT 485, 492, 102 F. Supp. 2d 486, 493 (2000)). Therefore, no deference is afforded to the agency's new statutory interpretation embodied in a new rule or regulation where the agency gives a retroactive effect to its regulation without explicit notice. *See Rhone Poulenc, Inc. v. United States,* 14 CIT 364, 365, 738 F. Supp. 541, 543 (1990) ("[A]n administrative regulation will not be construed to have retroactive effect unless the language requires such a result.").

## III.  DISCUSSION

### A.  The Statutory and Regulatory Scheme for Assessment of Antidumping Duties

Dumping is initially determined in a less-than-fair-value investigation.  If Commerce makes a preliminary affirmative determination that dumping is occurring, it "attempt[s] to determine an individual weighted-average dumping margin . . . for each known exporter or producer of the subject merchandise."  *See* 19 C.F.R. § 351.204(c) (2005).  Commerce assesses antidumping duties based on the amount "the normal value of the merchandise exceeds the export price (or the constructed export price) of the merchandise."  *See* 19 U.S.C. § 1673e(a)(1) (2000).  "The Department also calculates an 'all-others' dumping margin, which is the simple average of the calculated company-specific margins."  63 Fed. Reg. at 55,362.  Commerce applies this "all-others" rate to entries of merchandise from producers and exporters for which the Department has not established a company-specific rate.  Commerce publishes its preliminary determination notice and directs Customs to collect a bond or cash deposit at the time the merchandise subject to an investigation enters the United States.  *See* 19 U.S.C. § 1673b(d).  Then, if the International Trade Commission makes a final affirmative determination that the dumping is causing injury to a United States industry, Commerce calculates final dumping margins, publishes an antidumping duty order, and instructs Customs to continue to collect a cash deposit of estimated antidumping and countervailing duties at the rates included in the final determination.  *See* 19 C.F.R. § 351.211.

A subsequently published antidumping order "requires the deposit of estimated antidumping duties pending liquidation of entries of merchandise at the same time as estimated

normal customs duties on that merchandise are deposited." 19 U.S.C. § 1673e(a)(3). For

resellers, Commerce determines cash deposit rates as follows:

> The Department instructs Customs to apply any reseller's company-specific cash
> deposit rate to entries of merchandise sold by that reseller. If there is no
> company-specific reseller cash deposit rate and the importer identifies the
> producer, the Department instructs Customs to apply the producer's cash deposit
> rate to the entry. This logic stems from the fact that, when subject merchandise
> enters the United States through a reseller, the Department does not know who set
> the price of the subject merchandise to the United States. The Department
> instructs Customs to apply the producer's cash deposit rate where the producer of
> the merchandise is identified on the assumption that the producer knew that the
> merchandise was destined for the United States. This assumption is more often
> true than not. Subject merchandise sold through a reseller and imported where
> there is no company-specific reseller rate or where the importer did not identify
> the producer of the merchandise is subject to the all-others cash deposit rate.

63 Fed. Reg. at 55,362.

The antidumping duty imposed by this final order is reviewable "[a]t least once during

each 12-month period beginning on the anniversary of the date of [its] publication" pursuant to

19 U.S.C. § 1675(a)(1). Any "interested party," defined by 19 U.S.C.A. § 1677(9) and including

the importer of record, can request administrative review of an antidumping duty order pursuant

to 19 U.S.C.A. § 1675. For example, interested parties can "request a review of a reseller which

does not have its own rate because they believe the actual dumping liability is higher or lower

than the cash deposit or, if the producer which supplied the reseller is reviewed, the all-others

rate." 63 Fed. Reg. at 55,362. If no review of a producer's sales is requested, automatic

liquidation applies to entries of merchandise exported by that producer. *See* 19 C.F.R. §

351.212(b). "Likewise, entries of a producer's merchandise sold to the United States by a

reseller will be liquidated at the producer's cash deposit rate (if there is no company-specific rate

for the reseller at the time of entry and no review has been requested for either the producer or the reseller)." 63 Fed. Reg. at 55,363.

During an administrative review, Commerce analyzes the data related to the named respondent, whether it is the manufacturer or third-party reseller that sold or exported subject merchandise to the United States. *See* 19 C.F.R. § 351.213. Importantly, Commerce must examine the first sale where the manufacturer or reseller knew merchandise would be exported to the United States. *See* 19 U.S.C. § 1677a (stating that "export price" is "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States"). When the manufacturer knows the destination of its products sold to a reseller, then the manufacturer's sale to such reseller will be within the scope of the review. Otherwise, any entries of merchandise that come to the United States without the producer's knowledge and for which liquidation has been suspended at the producer's cash deposit rate will not be subject to a final antidumping duty rate at the conclusion of the producer's review. *See* 63 Fed. Reg. at 55,363. "The determination [resulting from the review] shall be the basis for the assessment of countervailing or antidumping duties on entries of merchandise covered by the determination." 19 U.S.C. § 1675(a)(2)(C).

In the October 15, 1998, notice of its Reseller Policy, Commerce explained that there was confusion about its practice of assigning the producer's cash deposit rate to resellers that identify the producer at the time of entry. *See* 63 Fed. Reg. at 55,361. "At issue [was] whether a

producer's company-specific cash deposit rate can serve as the basis for automatic liquidation

under section 351.212(c) where an intermediary (e.g., a reseller, a trading company, an exporter)

exports the merchandise and where the entries are suspended at the producer's cash-deposit rate."

*Id.* at 55,361-62. Commerce explained its position as follows:

> [A]utomatic liquidation at the cash deposit rate required at the time of entry can
> only apply to a reseller if no administrative review has been requested, either of the
> reseller or of any producer of the merchandise the reseller exported to the United
> States, and the reseller does not have its own cash deposit rate. If the Department
> conducts a review of a producer of the reseller's merchandise where entries of the
> merchandise were suspended at the producer's rate, automatic liquidation will not
> apply to the reseller's sales. If, in the course of an administrative review, the
> Department determines that the producer knew that the merchandise it sold to the
> reseller was destined for the United States, the reseller's merchandise will be
> liquidated at the producer's assessment rate which the Department calculates for
> the producer in the review. If, on the other hand, the Department determines in the
> administrative review that the producer did not know that the merchandise it sold
> to the reseller was destined for the United States, the reseller's merchandise will
> not be liquidated at the assessment rate the Department determines for the producer
> or automatically at the rate required as a deposit at the time of entry. In that
> situation, the entries of merchandise from the reseller during the period of review
> will be liquidated at the all-others rate if there was no company-specific review of
> the reseller for that review period.

*Id.* at 55,362. This position became Commerce's policy on May 6, 2003, and is not challenged

by Plaintiff. *See* 68 Fed. Reg. 23,954. Rather, Parkdale and Russel challenge its application by

Commerce as impermissibly retroactive.

**B. Retroactivity and the Reseller Policy**

Generally, a retroactive application of a regulation is permissible when Congress

explicitly authorizes such effect. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208

(1988) (holding that "congressional enactments and administrative rules will not be construed to

have retroactive effect unless their language requires this result"); *Shakeproof Assembly*, 24 CIT at 492, 102 F. Supp. 2d at 493. "Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant." *Bowen*, 488 U.S. at 208-09; *see id* at 216 (Scalia, J., concurring in the judgment) (observing that rule-making under Administrative Procedure Act contemplates rules having future effect). However, "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based in prior law." *Princess Cruises, Inc. v. United States*, 397 F.3d 1358, 1362 (Fed. Cir. 2005). A retroactive provision "impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). The appropriate test is "whether the new provision attaches new legal consequences to events completed before its enactment."[3] *Id.* at 270. The Federal Circuit elaborated on the proper analysis of retroactivity:

> the court must consider not only in a bright-line fashion whether a rule, regulation, or decision [1] "creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past," but must also consider more comprehensively [2] the "nature and extent of the change of the law," [3] "the degree of connection between the operation of the new rule and a relevant past event," and [4] "familiar considerations of fair notice, reasonable reliance, and settled expectations."[4]

---

[3]*Landgraf* stated that "the presumption against statutory retroactivity is not restricted to cases involving 'vested rights.'" 511 U.S. at 275 n.29.

[4]The Federal Circuit adopted the Supreme Court's explanation in *Landgraf* as guidance in evaluating retroactivity:
> The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past

*Princess Cruises*, 397 F.3d 1362-63 (noting that "[m]erely categorizing rules or applications of rules as 'clarifications' or 'changes' provides little insight into whether a retroactive effect would result in a particular case").

Parkdale claims that because the Reseller Policy applies to merchandise entered between August 1, 2002, and July 31, 2003, the policy is retroactive in nature. Plaintiff contends that the Reseller Policy imposed additional legal consequences on Parkdale by changing "the circumstances under which resellers are relieved of additional liability, over and beyond the deposits already made." Pl.'s Br. 8. Characterizing the Reseller Policy as a radical "coin-flip" rule, Parkdale maintains that Commerce did not provide resellers with "fair notice" that additional duties on merchandise might be owed. Pl. Br. 9. As a reseller, Parkdale reasonably relied on the assumption that the cash deposit rate would be the assessment rate unless an administrative review of the reseller was requested. Parkdale further claims that resellers do not have the option of undoing entries made prior to the May 6, 2003, date of the Department's new assessment policy, and therefore, any contrary rule applied to entries prior to this date is retroactive. Pl.'s Br. 9.[5]

---

event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have sound instincts and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.
*Landgraf*, 511 U.S. at 269-70.

[5] Parkdale explains that after it had already taken the irreversible step of entering and reselling the merchandise, "Commerce changed the rules and allowed automatic liquidation upon fulfillment of a significant additional condition, namely that no party requests an administrative review of an unrelated third party." Pl. Br. 11. In this case that party would be Stelco, the producer from whom Parkdale purchased the merchandise. Pl. Br. 11. Parkdale argues that as a

Commerce counters the Reseller Policy did not have an impermissibly retroactive effect because the "Reseller Policy became effective upon entries for which the anniversary month occurred in May 2003 or later," i.e., after the publication of the new policy on May 6, 2003. Def.'s Br. 12. Defendant directs attention to its regulation providing that an administrative review covers all merchandise entered 12 months prior to "the most recent anniversary month." 19 C.F.R. § 351.213(e)(1)(I); *see* 19 U.S.C. § 1675(1). Commerce emphasizes that when "no information about import transactions with a particular reseller is before Commerce during the review, then the transactions of an importer who imports the subject merchandise from that reseller do not fall within the scope of the review." *See Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003), *opinion after remand* 28 CIT __, 346 F. Supp. 2d 1343 (2004), *aff'd*, 412 F.3d 1266 (Fed. Cir. 2005). This Court has upheld Commerce's "discretion to determine when and how to implement the final results beyond their literal, statutory scope." *Id.* Consequently, Commerce has authority to decide how to extend its determinations. Additionally, Commerce claims that since both parties were afforded the opportunity to file for administrative reviews, the Reseller Policy did not create "a new obligation, impose[] a new duty or attach[] a new disability, in respect to transactions or considerations already past." Def.'s Br. 13-14 (quoting *Princess Cruises*, 397 F.3d at 1358).

---

result of the Reseller Policy, "it no longer had reasonable protection against *additional* liability through automatic liquidation, because instead of needing only to rely upon a condition that had always occurred in the past (that nobody requests an administrative review of Parkdale), Parkdale also had to hope for something much less probable (that nobody would request an administrative review of Stelco)." Pl. Br. 11.

Commerce concedes that pursuant to *Princess Cruises* there was a relatively significant change in Commerce's treatment of resellers. Def.'s Br. 15. *See Consol. Bearings*, 412 F.3d at 1267 (concluding that "substantial evidence supports Commerce's determination that it has in the past consistently liquidated unreviewed entries from an unrelated reseller at the cash deposit rate when the manufacturer has no knowledge that the subject merchandise is ultimately destined for the United States"); *Consol. Bearings*, 346 F. Supp. 2d at 1346 (stating that "Commerce indicates that the [Reseller Policy] altered [Commerce's] past practice of assessing certain unreviewed entries at the cash-deposit rate to assessing them at the all-others rate"). The court will now turn to the other factors listed by the Federal Circuit to determine whether the Reseller Policy's application in this case was impermissibly retroactive.

1. *The Degree of Connection Between the Operation of the New Rule and a Relevant Past Event*

A retroactive rule "must also have a significant retroactive connection with past events." *Princess Cruises*, 397 F.3d at 1366. Prior to the Reseller Policy, Commerce would automatically liquidate a reseller's merchandise at the deposit rate unless the reseller or another petitioner took affirmative steps to request an administrative review of the reseller. The Reseller Policy changed the rate of liquidation in cases where the reseller is not reviewed. Parkdale contends that because resellers do not have the option of undoing importations before May 6, 2003, the date of the new assessment policy, the connection between its entry of merchandise and the new rule is significant. However, although the new rule affected the importer's ultimate liability, the degree of connection between the new rule and the entry of merchandise at issue is not significant

because under relevant customs and antidumping duty laws the importer does not have a right to expect that duties would not change until entries are liquidated. *Cf. id.* at 1365 (finding significant degree of connection where new rule imposed harbor maintenance tax on passenger cruise liner and where liner did not document which passengers disembarked prior to rule to rebut evidentiary presumption of new rule).

Under Customs law, importers are put on notice that changes may occur to duties until liquidation or reliquidation of entries at issue. *See* 19 U.S.C. § 1500; *Dart Exp. Corp. v. United States*, 43 C.C.P.A. 64, 76 (1956). "No vested right to a particular classification or rate of duty or preference is acquired at the time of importation." *N. Am. Foreign Trading Corp. v. United States*, 783 F.2d 1031, 1032 (Fed. Cir. 1986) (citing *Norwegian Nitrogen Prods. Co. v. United States*[6], 288 U.S. 294, 318 (1932)). In cases involving importers' challenges to the application of new laws based on retroactivity, the courts have looked at liquidation as the relevant "past event" with respect to the operation of a new rule. *See, e.g. Travenol Labs., Inc. v. United States*, 118 F.3d 749, 753 (Fed. Cir. 1997) (holding that liquidation or reliquidation of entries "is the triggering or operative event" for deciding whether application of statute or regulation is impermissibly retroactive); *Syva Co. v. United States*, 12 CIT 199, 204, 681 F. Supp. 885, 890 (1988) (stating that "the statute merely prescribes the time for payment of duties once the entries are liquidated, and since liquidation, the operative event triggering the time for assessment of

---

[6] "No one has a legal right to the maintenance of an existing rate or duty." *Norwegian Nitrogen Prods.*, 288 U.S. at 318 (holding that Congress' or congressional committees' failure to give notice to parties affected by proposed change in tariff laws would not affect validity of change and that hearing cannot be demanded as of right).

interest, occurred after the statute was enacted, there is no retroactive application which would deprive plaintiff of any vested substantive right").

In the context of antidumping duty laws, the effect of liquidation as a triggering event is even more pronounced. Commerce operates "a 'retrospective' duty assessment system under which importers' final liabilities are determined after the actual importation of the merchandise." *Mittal Can., Inc. v. United States*, Slip Op. 06-20, 2006 WL 319217, at *7 (not reported in F. Supp. 2d) (citing 19 C.F.R. § 351.212[7]). While importers entering merchandise subject to an antidumping duty order are required to make a cash deposit of *estimated* antidumping duties, this rate is not final if an administrative review is initiated. *Id.* When an administrative review covers a different party, 19 U.S.C. § 1675(a)(2)(C) does not afford an importer a statutory right to "enjoy . . . the rates established by the review." *Consol. Bearings*, 348 F.3d at 1005-06. As Commerce explains, importing the same merchandise does not mean that different importers will be subject to the same antidumping duties. *See id.* at 1006 (stating that section 1675(a)(2)(C) "neither requires nor precludes Commerce from applying [administrative review] results to entries outside the review"). These statutory and regulatory provisions significantly weaken

---

[7] 19 C.F.R. § 351.212 provides:
Unlike the systems of some other countries, the United States uses a "retrospective" assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported. Generally, the amount of duties to be assessed is determined in a review of the order covering a discrete period of time. If a review is not requested, duties are assessed at the rate established in the completed review covering the most recent prior period or, if no review has been completed, the cash deposit rate applicable at the time merchandise was entered. This section contains rules regarding the assessment of duties, the provisional measures deposit cap, and interest on over - or undercollections of estimated duties.

Parkdale's position, because while entering merchandise is a relevant "past event" within the meaning of the *Princess Cruises* analysis,[8] it is not the triggering and operative event[9] that determines the assessment of antidumping duties.

2. *Considerations of Fair Notice, Reasonable Reliance, and Settled Expectations*

The court also considers fair notice, reasonable reliance, and settled expectations. *Princess Cruises*, 397 F.3d at 1366 (citing *Landsgraf*, 511 U.S. at 270). In this case, Plaintiff and Plaintiff-Intervenor had fair notice of Commerce's change in policy. Parkdale initially had notice of Commerce's proposed new policy regarding unreviewed resellers when it was preliminarily issued in 1998, years before the entries made during the period of review from August 8, 2002, through July 31, 2003. *See* 63 Fed. Reg. 55,361. Commerce gave additional notice to all resellers of this proposed change in March 2002. 67 Fed. Reg. 13,599. Parkdale even submitted comments on the proposal at this intermediate stage in the proceedings prior to the new rule becoming final. *Issues and Decision Mem.*, at 10 (stating that Parkdale submitted comments on April 1, 2002, and Rusell supported Parkdale's views). Parkdale's comments evidence its awareness of the new policy. Importantly, the published Reseller Policy was applicable to entries made during the time for which parties could request a review after May 6, 2003. *See Rhone Poulenc*, 14 CIT at 365, 738 F. Supp. at 543. Commerce published its notice

---

[8]Specifically, in *Princess Cruises*, the Federal Circuit considered the importer's non-collection of data regarding how many passengers disembarked and/or boarded at layover ports covered by the new harbor maintenance tax. *Princess Cruises*, 397 F.3d at 1366.

[9]Defendant-Intervenor, United States Steel Corporation, alternatively proposed that the past triggering event for evaluating retroactivity is the time when the administrative review was requested.

of opportunity to request an administrative review of subject merchandise for the relevant period

of review on August 1, 2003, several months after the new rule came into effect, and Parkdale

had until September 2, 2003, to file such a request.[10]  *See* 68 Fed. Reg. 45,218; *cf. ALZ N.V. v.*

*United States*, 27 CIT __, 283 F. Supp. 2d 1302 (2003).[11]

Regarding reasonable reliance and settled expectations, nothing in the statutory or

regulatory scheme provides Parkdale with an expectation that no one will request an

administrative review of Parkdale.  *See* Def. Br. 18.  Parkdale's rationale that it "reasonably

relied on the assumption that the cash deposit rate would be the assessment rate unless the

reseller or the petitioner requested an administrative review of the reseller . . . [and] no party had

---

[10] "The fact that the subject merchandise may have entered before the publication of this clarification is immaterial because interested parties were aware of the new methodology prior to the start of the instant administrative review." *Issues and Decision Mem.* 11 (citing Reseller Policy, 68 Fed. Reg. 23,954, 23,956.

[11] In *ALZ N.V.*, Commerce adopted new countervailing duty methodology expressly making it applicable to all "CVD investigations initiated on the basis of petitions filed after December 28, 1998." 283 F. Supp. 2d at 1310 (citing 19 C.F.R. § 351.702).  Prior to this rule, Commerce conducted a countervailing duty investigation, finding in March 1999 that GOB's purchase of the ALZ shares did not constitute countervailable subsidies.  In July 2000, domestic parties requested that Commerce reinvestigate the Government of Belgium's (GOB) purchase of ALZ stock in 1985. *Id.* at 1305.  Commerce reinvestigated the issue under the new methodology published in November 1998 and reached an opposite result in April 2001. *Id.*  This Court held that Commerce could not apply the new methodology because the initial petition for this review was filed in March 1998, prior to the regulation's effective date of December 28, 1998. *Id.* at 1311.  The Court noted that "the plain language of the regulations states that they apply to [a]ll CVD investigations initiated *on the basis of petitions filed after December 28, 1998.*" *Id.* at 1311 n.5 (emphasis added).  The Court found that "the presumption against retroactivity would counsel against such application in this case because application of the amended regulations to conduct occurring almost fifteen years before their amendment would arguably impose new duties with respect to transactions already completed." *Id.* at 1311.  The present case is distinguishable from *ALZ N.V.* because Commerce did not apply the new policy in contradiction with the date expressly stated in the May 6, 2003, notice.

ever previously requested an administrative review of Parkdale," Pl.'s Br. 12, impairs even Parkdale's strongest argument – that it suffered additional duty liability for past transactions. This position overlooks a statutory provision that any "interested party" can initiate an antidumping review. *See* 19 U.S.C. § 1675. There can be no objectively reasonable reliance on past non-occurrence of administrative actions otherwise warranted by the regulatory scheme. Nor can Parkdale successfully maintain that the all-others rate is an unfairly adverse rate, as the Department determines the "all-others" dumping margin based on the simple average of the calculated company-specific margins. *See* 63 Fed. Reg. at 55,362.

The court is not persuaded by Parkdale's argument that administrative review was a "false choice." Indeed, losing a right to effective administrative review would disturb both reasonable reliance and settled expectations. Pl.'s Br. 13-14. However, Parkdale and Plaintiff-Intervenor Russel offer only unsubstantiated arguments about futility and hardship of hypothetical administrative reviews for resellers that simply do not enhance their claim of retroactivity. They insist that it would have been difficult for them to participate in a review. Parkdale explains that it would experience enormous hardship as a reseller because of its inability to provide production costs of the merchandise that Parkdale resold and that it would have been subject to determination of its dumping margin based on "facts otherwise available." 19 U.S.C. § 1677e. Parkdale specifically referred to Russel's experience of attempting to go through an administrative review to avoid the liability of the 18.71 % "all-others" rate and withdrawing after Commerce refused to give Russel "any assurance that it would not penalize Russel for not being able to obtain production costs from an unaffiliated supplier." *See*

*Parkdale's Case Br.* 9 (citing Letter from Barbara E. Tillman to Beatrice A. Brickell (Dec. 29, 2003), A.R. Doc. No. 48).

Parkdale's claim that it would not get a satisfactory dumping margin upon review does not merit the court's consideration because 19 U.S.C. § 1677e[12] contemplates such results. *See, e.g.*, *Peer Bearing Co. v. United States*, 16 CIT 799, 805-06, 800 F. Supp. 959, 965 (1992) (finding that when resellers choose uncooperative suppliers that are under dumping order, it is irrelevant that such resellers are cooperative in their questionnaire responses). Furthermore, Russel withdrew from the review before its completion and simply does not serve as an example of Parkdale's "false choice" argument. *Cf. Koyo Seiko Co. v. United States*, 26 CIT 170, 176, 186 F. Supp. 2d 1332, 1339 (2002) (holding that foreign manufacturer was not required to exhaust administrative remedies before challenging Commerce's methodology for determining antidumping duty assessment rates because methodology had been previously unsuccessfully challenged at administrative level and additional challenge during review at issue would have been futile). Additionally, this Court recognizes that while "[s]mall businesses may face a dilemma where they can neither afford to participate in an administrative review nor to pay an erroneous antidumping rate[,] . . . the cost-benefit analysis and risk assessment involved is one

---

[12] In pertinent part, 19 U.S.C.A. § 1677e provides that "[i]f . . . necessary information is not available on the record, . . . the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle."

an importing business must take." *J.S. Stone, Inc. v. United States*, 27 CIT __, __, 297 F. Supp.

2d 1333, 1344 (2003).

### C. Plaintiff-Intervenor's "Practicable Assistance" Argument

In addition to supporting Parkdale's claim of unlawful retroactive application of the

policy, Russel alleges that Commerce did not comply with 19 U.S.C. § 1677m(c)[13] when it failed

in its duty to provide "practicable assistance" within meaning of that statute. *See Russel Br.* 11.

Specifically, Russel claims that Commerce failed in this duty when it did not respond to Russel's

"requests for assistance in answering section D of the antidumping questionnaire and did not

---

[13] Section 1677m(c) places a duty on Commerce to provide assistance to an importer who is unable to obtain the required information and suggests "alternative forms in which they are able to comply with the request." *China Steel Corp. v. United States*, 27 CIT __, __, 264 F. Supp. 2d 1339, 1356 (2003). It provides:

(c) Difficulties in meeting requirements
(1) Notification by interested party
If an interested party, promptly after receiving a request from the administering authority or the Commission for information, notifies the administering authority or the Commission (as the case may be) that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, the administering authority or the Commission (as the case may be) shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party.
(2) Assistance to interested parties
The administering authority and the Commission shall take into account any difficulties experienced by interested parties, particularly small companies, in supplying information requested by the administering authority or the Commission in connection with investigations and reviews under this subtitle, and shall provide to such interested parties any assistance that is practicable in supplying such information.
19 U.S.C §1677m(c).

properly consider the alternative forum in which Russel Metal Export could submit the cost information."[14] Pl.-Intervenor's Br. 11. Russel also states that it withdrew by the December 23, 2003, deadline because it did not receive a response from Commerce in response to its November 21, 2003, request.

Commerce claims that it responded to Russel appropriately by instructing it to supply the information to the "best of its ability." Def. Br. 25. Alternatively, Commerce claims that this argument is beyond the scope of this proceeding since it is not an issue raised by the Plaintiff. "[I]ntervenor is limited to the field of litigation open to the original parties, and cannot enlarge the issues tendered by or arising out of plaintiff's bill." *Torrington Co. v. United States*, 14 CIT 56, 57, 731 F. Supp. 1073, 1075 (1990) (citing *Chandler & Price Co. v. Brandtjen & Kluge, Inc.*, 296 U.S. 53, 56 (1935)) (granting plaintiff's motion to strike defendant-intervenor's affirmative defenses because they raised issue of standing not contested by plaintiff and defendant); *see also Grupo Indus. Camesa v. Unites States*, 18 CIT 107, 108 (1994) (not reported in F. Supp.) (holding that plaintiff-intervenor's argument was separate from plaintiff's claim because plaintiff did not challenge pertinent statute as unconstitutional even though complaint alleged that ITC's determination was not in accordance with law "in a number of respects, including the following").

Russel's claim that Commerce failed to provide "practicable assistance" under section 1677m is a claim distinct from Parkdale's even as it challenges Commerce's actions in a

---

[14] Russel claims that it explained its difficulties in obtaining the cost of production numbers on two separate occasions and suggested as an alternative that the acquisition price be used instead. (Pl.-Intervenor's Br. 14.).

proceeding that Parkdale initiated.  *See, e.g.*, *China Steel*, 264 F. Supp. 2d at 1358 (involving claim as to whether "Commerce's duty to assist interested parties experiencing difficulties" was triggered during process of completing antidumping questionnaire).[15]  Parkdale does not raise the issue of whether Commerce provided practicable assistance under 19 U.S.C. § 1677m(c).  Parkdale would not be able to raise such an issue because it did not opt to go through an administrative review, let alone fill out a questionnaire, which is when Commerce would have been expected to provide the required assistance.  Therefore, Russel's allegation that Commerce failed its duty under 19 U.S.C. § 1677m(c) goes beyond the scope of Parkdale's complaint and cannot be adjudicated in this proceeding.[16]

## IV.  CONCLUSION

Commerce's application of its Reseller Policy upon entries of subject merchandise exported by Plaintiff and Plaintiff-Intervenor is in accordance with law.  Contrary to Parkdale's contentions, because Commerce's Reseller Policy became effective upon entries for which the

---

[15]In *China Steel*, the court found that plaintiff did "not meet the threshold requirements of 19 U.S.C. § 1677m(c)(1), as Plaintiff neither explain[ed] in detail the difficulties it experienced, nor suggest[ed] alternatives for supplying the deficient information."  264 F. Supp. 2d at 1357.

[16]There is record evidence that Commerce attempted a minimal response to Russel's concerns, but the court need not decide whether these attempts were sufficient under the statute. If the court had found the application of the Reseller Policy impermissibly retroactive and therefore not in accordance with law, Russel would have been entitled to relief.

anniversary month was May 2003 or later, the policy does not have an impermissibly retroactive

effect. Accordingly, Plaintiff's motion for summary judgment on the agency record is denied.


April 17, 2006                                              /s/ Judith M. Barzilay

Dated: _____                    _____

New York, NY                                            Judith M. Barzilay, Judge

ERRATUM

*Parkdale International v. United States*, Court No. 05-00316, Slip-Op 06-54, dated April 17, 2006.

Page 4:        Replace the block quote citing *Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties*, 68 Fed. Reg. 23,954, 23,954 (Dep't Comm., May 6, 2003) with this block quote:

> [A]utomatic liquidation at the cash-deposit rate required at the time of entry can only apply to a reseller which does not have its own rate if no administrative review has been requested, either of the reseller or of any producer of merchandise the reseller exported to the United States. If the Department conducts a review of a producer of the reseller's merchandise where entries of the merchandise were suspended at the producer's rate, automatic liquidation will not apply to the reseller's sales. If, in the course of an administrative review, the Department determines that the producer knew, or should have known, that the merchandise it sold to the reseller was destined for the United States, the reseller's merchandise will be liquidated at the producer's assessment rate which the Department calculates for the producer in the review. If, on the other hand, the Department determines in the administrative review that the producer did not know that the merchandise it sold to the reseller was destined for the United States, the reseller's merchandise will not be liquidated at the assessment rate the Department determines for the producer or automatically at the rate required as a deposit at the time of entry. In that situation, the entries of merchandise from the reseller during the period of review will be liquidated at the all-others rate if there was no company-specific review of the reseller for that review period.